KLEIN v. POLLARD.

1. ARREST—WITHOUT WARRANT—PROPRIETY.

    A police officer is not justified in arresting without a warrant a woman quietly walking on the street at a late hour of the night, though she has just emerged from a disreputable saloon, there being nothing to indicate that she is plying a prostitute's vocation, or intends to do so, by solicitation.[1]

2. FALSE IMPRISONMENT — DAMAGES — MITIGATION — EVIDENCE — POLICE ORDERS.

    In an action against a policeman for false imprisonment in arresting plaintiff without a warrant on suspicion that she was a prostitute, defendant is entitled to show in mitigation of damages that his superior officers ordered the arrest of all women found on the street at an unusual hour who failed to give a satisfactory account of themselves, though such arrest was unlawful.

Error to Wayne; Donovan, J. Submitted April 2, 1907. (Docket No. 2.) Decided July 13, 1907.

Case by Anna C. Klein against Edward J. Pollard for an assault 'and battery and false imprisonment. There was judgment for defendant, and plaintiff brings error. Reversed.

Plaintiff is the wife of one William C. Klein, who kept a saloon at 227 Jefferson avenue, in the city of Detroit. In the back part of his saloon was a room with tables for drinking and a bed. The saloon was one of ill repute and the resort of prostitutes. On one occasion a policeman found in this bed the bartender and a prostitute undressed, and arrested them. Mr. Klein kept his saloon open during the night, in open violation of the law, and apparently without any effort on the part of the city authorities to compel him to obey the law. The saloon is

---

[1] As to liability of an officer for making an arrest, see note to *Leger* v. *Warren* (Ohio), 51 L. R. A. 193.

located in what is known as the "central precinct," in which are located many, if not most, of the disreputable houses of the city, and where common prostitutes and other criminal classes resort. Counsel for defendant in his brief says:

"Practically all disorderly places, houses of prostitution, etc., in the city of Detroit are in the central precinct, which embraces the territory between Hastings street and Fourth street, and running north to Charlotte avenue and Brewster street. Previous to the year 1905 (the time not being disclosed by the record) the number of lewd women plying their vocation on the streets and sitting in saloons waiting for company became so great that, to discourage the trade, a general order was issued to the officers and men of the central precinct to frequently visit all saloons catering to women trade and to bring in all women of known bad repute, or such as might be found on the street at an unusual hour and who failed to give a satisfactory account of themselves. As a result of this order over 400 women were brought in during the year 1905."

The proofs establish the above statement. The defendant is a policeman, and his beat in February, 1905, included Mr. Klein's saloon. Plaintiff and her sister, a girl 16 years of age, after spending the evening upon the streets, went to this saloon about 10:30 o'clock. The sister had made an appointment to meet one Nuss at Klein's saloon, where he played the piano. The women remained in the saloon until about midnight, when plaintiff's sister and Nuss went out. A few minutes afterwards plaintiff came out of the saloon, stood for a moment at the door, looking up and down the street, and then with her head hanging down walked out along the street. The defendant saw her, went to her, and asked her who she was. She testified that she told him who she was. Defendant testified that she told him it was none of his business. She testified:

"Is it not a fact, Mrs. Klein, that when you came out of that saloon you looked first right and left when you came to the door to see if the coast was clear, and then came down the avenue, with your head hanging down,

that you went down Randolph, turned north on Randolph on the east side, and that the officer came along behind you, intercepted you by coming diagonally across Randolph, and intercepted you about half way between the alley and the corner—is that true?

" *A.* Yes, sir."

He then, in accordance with his instructions, took her to the police department before the lieutenant in charge. She told the lieutenant who she was, satisfied that officer that her statement was true, and was promptly dismissed. She brought this suit to recover damages for assault and battery and false imprisonment. The case was submitted to the jury who found a verdict for the defendant.

The charter of the city of Detroit confers upon the common council power to—

" Provide for the general peace, order and good government of said city.   To 'prohibit and suppress the keeping and leasing of houses of ill-fame, or assignation, or for the resort of common prostitutes, disorderly houses, and disorderly groceries.   It may restrain, suppress and punish the keepers thereof, and the owners and lessors of such premises; it may punish, restrain and prevent common prostitutes, vagrants, mendicants, street beggars, drunken or disorderly persons.'   To enact all ordinances necessary to carry into effect the powers conferred by law upon said council, and to provide for the punishment of all persons offending against this act, or any law relating to said city, or any ordinance of the common council enacted under this or any other act of the legislature, by imposing fines, penalties, forfeitures and costs, and by imprisonment in the house of correction of said city."   Charter of Detroit (1904), §§ 171, 183, 190.

The charter (§ 665) also provides:

" It shall be the duty of the commissioner of police and of the force hereby constituted, at all times of the day and night, within the boundaries of said city, to preserve the public peace and prevent crime, arrest offenders and protect the rights of persons and property, guard the public health, preserve order and enforce all the laws of the State and the ordinances of said city."

Acting under this power the common council ènacted the following ordinances:

"All able-bodied persons who, not having visible means of support, are found loitering or rambling about or lodging or loitering in drinking saloons, tippling houses, beer houses, houses of ill-fame, houses of bad repute, vessels, sheds or barns, or in the open air, and not giving a good account of themselves, * * * shall be deemed disorderly persons, and upon conviction thereof shall be punished as hereinafter provided.

"No person shall keep, within the limits of the city of Detroit, any house of ill-fame, house of assignation, or house for the resort of common prostitutes, or a disorderly saloon, bar-room, tavern, beer hall, grocery, theater; room, ordinary, house or building of any kind, or any house, room or building for gaming with cards, dice, billiards, nine or ten-pin alleys, wheels of fortune, boxes, machines or other instruments or devices whatever, or shall in any manner contribute to the support, carrying on or keeping of any such house or place."

The case was submitted to the jury who, after deliberation, returned a verdict for no cause of action.

*Richard I. Lawson* and *William G. Fitzpatrick*, for appellant.

*Fred H. Warren*, for appellee.

GRANT, J. (*after stating the facts*).    1. The court in his charge said to the jury that it was clearly proven that the saloon from which the plaintiff came at midnight was a disorderly one. The fact so stated is not denied. The court instructed the jury that, if the defendant's statement as to what happened between him and plaintiff was correct, he was justified under the law in taking the plaintiff to police headquarters for examination by the lieutenant in charge. This presents the principal question in the case. It is the contention of counsel for the plaintiff that her arrest was unlawful because it was without a complaint or warrant, and she was not suspected of having committed a felony, neither was she engaged in commit-

ting a breach of the peace. *Tillman* v. *Beard*, 121 Mich. 475 (46 L. R. A. 215), and *Robison* v. *Miner*, 68 Mich. 549, do not control this case. In neither of those cases was there any excuse for arresting the party without obtaining a warrant. One was the case of a peddler in a street, the other the case of a saloonkeeper keeping his saloon open at a time prohibited by law. The duty imposed upon the police department to protect the city from vagrants, night-walkers, gamblers, and other sorts of criminals who ply their vocation largely in the night is an important and difficult one. No rule can be laid down governing all the circumstances under which a party under suspicion may be arrested. It is, however, established by a decision of this court (which seems to have escaped the attention of counsel of both parties and of the trial court, as it is not cited in their briefs) that the arrest of plaintiff was unlawful. *Pinkerton* v. *Verberg*, 78 Mich. 573 (7 L. R. A. 507). Police officers are not justified in arresting a person quietly walking the streets of the city at any hour of the night simply because he has emerged from a disreputable place. There is no evidence in this case to show that plaintiff was a prostitute, except the fact that she had been seen in her husband's disreputable saloon, and came therefrom late in the night. She was quiet, peaceable, making no disturbance, and there was nothing to indicate that she was plying a prostitute's vocation, or intended to do so, by solicitation. The chief difference between the facts of *Pinkerton* v. *Verberg* and those of this case are that in the former case plaintiff was arrested while peaceably walking the streets about an hour and a half earlier in the night than was the plaintiff in this case. In the former case the evidence on the part of defendant showed that the plaintiff was a prostitute, while in this case there is no such evidence. The defendant testified that he was in the saloon on the night in question, about a quarter of 11 o'clock, and that—

"It was my duty to go to this saloon every evening when I was on the beat nights, because it was disorderly,

prostitutes frequent there and disorderly men and women. We went to look after it, and *put. it in good running order*, and find who was there."

If the police department would, by complaints and arrests, enforce the law closing this saloon and others, as the law requires, it would much more effectually prevent disorder than the arrest of parties quietly walking the streets and apparently engaged in no criminal conduct. The better way "to put such places in good running order" is to compel obedience to the law which governs them. It follows that the arrest was unlawful, and the court should have so instructed the jury.

2. All circumstances which tended to show the good faith of the defendant were admissible in mitigation of damages. It was therefore competent to show the instruction of the defendant's superior officers in dealing with persons found upon the streets under circumstances in which the plaintiff was found.

Judgment reversed, and new trial ordered.

BLAIR, MONTGOMERY, HOOKER, and MOORE, JJ., concurred.